UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ACID PIPING TECHNOLOGY, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:04CV1667 CDP |
| ) | |
| GREAT NORTHERN INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

# **MEMORANDUM AND ORDER**

Acid Piping purchased a commercial insurance policy from Great Northern that covered losses from employee dishonesty. Acid Piping later learned that one of its employees had submitted dozens of fraudulent invoices, resulting in losses totaling hundreds of thousands of dollars. The sole issue at this stage of the litigation is whether the policy limit of $5,000 per loss caused by employee dishonesty applies only once, or whether the $5,000 limit applies to each fraudulent charge. I find that the policy language is ambiguous and therefore must be construed in favor of the insured. So construed, each fraudulent or double-billed invoice submitted by plaintiff's employee constitutes a separate loss under the insurance policy, and so the $5,000 limit applies to each separate fraudulent invoice. Therefore, I will grant plaintiff's motion for summary judgment on this issue.

## I. Background

The parties stipulated that the following facts apply to this case: plaintiff, Acid Piping Technology, Inc., is a Missouri corporation who engages in the business of marketing and selling pipe fittings and related products used in industrial piping systems. Many of Acid Piping's products are manufactured in the People's Republic of China. In a basic transaction in the ordinary course of business, Acid Piping would issue a purchase order to a Chinese trading company, who would then negotiate for the purchase of the various products from a Chinese manufacturer and arrange for the shipment of those products to Acid Piping or one of its customers. Acid Piping would pay the trading company's invoices by wire transfer. Finally, the trading company would pay the Chinese manufacturer for the products.

Acid Piping began employing Dong Kai in 1998. His responsibilities involved the facilitation of the transactions described above, including purchasing materials from Chinese manufacturers, negotiating prices for those materials, submitting purchase orders to Chinese trading companies, controlling quality of products purchased, assisting in shipping of products, and facilitating communication between Acid Piping and Chinese manufacturers and trading companies. In December of 2000, Acid Piping discovered that Dong Kai had created ninety-two purchase order invoices with inflated product costs, and had

double billed Acid Piping for freight charges on six different occasions.

Acid Piping was covered under a commercial insurance policy issued by defendant, Great Northern Insurance Company, which included a provision for employee dishonesty. The 'Blanket Employee Dishonesty' insurance coverage had a limit of $5,000 and a deductible of $1,000, which "applies separately to each occurrence." Policy at 6. The following provisions of the policy are also relevant:

**Limits of Insurance.**

>The most we will pay for any one loss is the amount of loss, not to exceed the Limits of Insurance stated in the Declarations.
>
>The payment of any loss under this insurance will not reduce our liability for other losses provided that our maximum liability does not exceed the Limit of Insurance stated in the Declarations applicable to:
>
>1. **blanket employee dishonesty**, for any loss caused by any employee whether acting alone or in collusion with others, either resulting from a single act or any number of acts, regardless of when those acts occurred, during the policy period of this insurance or prior insurance;
>
>2. **depositors forgery**, for any loss caused by forgery or alteration committed by any person or in which that person is concerned or implicated, either resulting from a single act or any number of acts, regardless of the number of instruments involved or when, during the period of this insurance or prior to it, such acts occurred.

**Subjects of Insurance.**
*Blanket Employee Dishonesty.*

> **Blanket employee dishonesty** means loss of money, securities or other property resulting from any fraudulent or dishonest acts committed by your employees, whether acting alone or in collusion with others.

Policy at 3. The issue before the Court is whether the above policy language should be read to provide Acid Piping with a separate claim for each fraudulent or double-billed invoice submitted by Dong Kai, or whether all of his dishonest behavior should be considered together as a single loss under the policy, so that the total recovery would be limited to the $5,000 limit of insurance after the $1,000 deductible.

## II. Discussion

### 1. Legal Standards

The standards for summary judgment are well settled. In determining whether summary judgment should issue, the Court views the facts and inferences from the facts in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The moving party has the burden to establish both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party has met this burden, the

nonmoving party may not rest on the allegations in its pleadings but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). At the summary judgment stage, I will not weigh the evidence and decide the truth of the matter, but rather I need only determine if there is a genuine issue for trial. Anderson, 477 U.S. at 249.

In this case, the parties have stipulated that the substantive law of Missouri controls interpretation of this insurance policy. My task is to determine how the Missouri Supreme Court would decide the issue at hand. See Lindsay Mfg. Co. v. Hartford Accident & Indem. Co., 118 F.3d 1263, 1267-68 (8th Cir. 1997. Both parties agree that this particular issue of insurance policy interpretation has not been addressed in Missouri. I must therefore look to the general rules of interpreting insurance policies established by the Missouri courts.

Interpretation of an insurance policy is a question of law. Standard Artificial Limb, Inc. v. Allianz Ins. Co., 895 S.W.2d. 205, 209 (Mo. Ct. App. 1995). The policy language must be given its ordinary and "plain meaning, consistent with the reasonable expectations, objectives, and intent of the parties." Id. The policy should be construed as a whole and where provisions are open to multiple interpretations, the construction most favorable to the insured will be adopted. Missouri Terrazzo Co., Inc. v. Iowa Nat. Mut. Ins. Co., 566 F.Supp. 546, 552 (E.D.

Mo. 1983). Since insurance policies are designed to provide protection, they are interpreted liberally so as to grant and not deny coverage. Centermark Properties, Inc. v. Home Indem. Co., 897 S.W.2d 98, 100-01 (Mo. Ct. App. 1995). As a result, exclusions and limitations are construed strictly against the insurer in order to give the insured the protection that he reasonably has a right to expect. Missouri Terrazzo, 566 F.Supp at 553.

The determination of whether an insurance policy is ambiguous is a question of law. Martin v. U.S. Fidelity & Guar. Co., 996 S.W.2d 506, 508 (Mo. 1999)(citing Gulf Ins. Co. v. Noble Broadcast, 936 S.W.2d 810, 813 (Mo. 1997)). While collateral facts may be considered to ascertain the subject matter of an unambiguous contract, such facts cannot cause the court to read into a contract something it does not say. Craig v. Jo B. Gardner, Inc., 586 S.W.2d 316, 324 (Mo. 1979). The language of an insurance policy is ambiguous when it is reasonably and fairly open to different constructions and a "duplicity, indistinctness, or uncertainty in the meaning of the language" exists. Martin, 996 S.W.2d at 508. However, an ambiguous phrase should not be considered in isolation, but must be read in light of the policy as a whole and by considering all associated words. Chase Resorts, Inc. v. Safety Mut. Cas. Corp., 869 S.W.2d 145, 150 (Mo. Ct. App. 1993)(citing U.S. Fire Ins. Co. v. Coleman, 754 S.W.2d 941, 944 (Mo. Ct. App. 1988)). If the Court

finds policy language to be ambiguous, it must construe that language against the insurer. Id. The Court will not find an ambiguity simply because the insured and insurer disagree as to the meaning of a contract. Phipps v. School Dist. of Kansas City, 645 S.W.2d 91, 100 (Mo. Ct. App. 1982).

### 2. The Policy Language is Ambiguous

Policy language is ambiguous if it is reasonably open to different constructions. Martin, 996 S.W.2d at 508. The insurance policy provisions at issue in this case are susceptible to multiple constructions, as is evidenced by the reasonable counter interpretations argued by the parties. The policy language "any loss caused by an employee ... either resulting from a single act or any number of acts" can be understood differently depending on what constitutes an individual "act." Acid Piping interprets an "act" as any single dishonest activity out of the multiple dishonest activities necessary to pass off a single overcharged or double-billed invoice. Great Northern interprets an "act" as the wrongdoing associated with each overcharged or double-billed invoice by an employee, such that "any number of acts" would constitute all the overcharged invoices in total.

These differing constructions represent two versions of how this policy could be interpreted, with both giving meaning to each word in the relative policy provision. The Court cannot find a policy to be ambiguous just because the parties

disagree as to its interpretation. However, when there is "a duplicity, indistinctness or uncertainty in the meaning of the language," Martin, 996 S.W.2d at 508, a contract is ambiguous. I conclude that when this policy is considered as a whole, it is ambiguous.

The coverage here is limited to payment for "any one loss" but the deductible provision of the policy "applies separately to each occurrence." In many of the cases cited by Great Northern, the policy language contained a clause limiting the payout on a per occurrence basis <u>and</u> a separate clause defining what constitutes an "occurrence." <u>See</u> <u>Wausau Business Ins. Co. v. US Motels Mgmt., Inc.</u>, 341 F.Supp.2d 1180, 1182 (D. Co. 2004)("limit of liability is $100,000 for any one 'occurrence.' 'Occurrence' is defined as ..."); <u>Reliance Ins. Co. v. Treasure Coast Travel Agency, Inc.</u>, 660 So.2d 1136, 1137 (Fla. Dist. Ct. App. 1995)("The most we will pay for loss in any one 'occurrence' is the applicable Limit of Insurance shown in the Declarations. The definition of occurrence is ..."); <u>Diamond Transp. System, Inc. v. Travelers Indem. Co.</u>, 817 F.Supp 710, 712 (N.D. Ill. 1993)("The most we will pay for loss in any one 'occurrence' is the applicable Limit of Insurance shown in the DECLARATIONS....'occurrence' is defined as..."); <u>Potomac Ins. Co. of Ill. v. Lone Star Web, Inc.</u>, 1994 WL 494784, *2 (N.D. Tex. 1994)("Plaintiff is liable to Defendant for each 'occurrence' of employee theft. The

Second Policy defines occurrence as ..."). There is no such policy language in our case that explains the relationship between an "occurrence" and a "loss." Although disagreement as to policy meaning and a lack of definition may not be enough to find a provision ambiguous, I find no surrounding or related clauses that clarify the language in this policy. The policy meaning is less clear when viewed as a whole. I conclude that were the Missouri Supreme Court to decide this issue, it would find the policy language ambiguous. Several Missouri cases support this conclusion.

The Supreme Court of Missouri has found the language of a commercial general liability policy ambiguous when the parties both had legitimate rationales for interpreting differently the phrase "subject otherwise to." Gulf Ins. Co., 936 S.W.2d at 814. The Court found the use of the word "otherwise" to create such an uncertainty or indistinctness that the language was reasonably open to the constructions advocated by both parties. The ambiguity was enhanced by the fact that the policy used both phrases "subject to" and "subject otherwise to" in the policy. Id. In this case, the language of the policy is sufficiently uncertain and indistinct as to find both constructions advocated by the parties to be reasonable. The ambiguity is strengthened by the policy's use of both 'loss' and 'occurrence' to limit coverage.

In another case, the Supreme Court of Missouri refused to find ambiguity in

the word "contents" contained in the building and personal property coverage provision of an insurance policy. Peters v. Employers Mut. Cas. Co., 853 S.W.2d 300, 303 (Mo. 1993). In that case, the parties had construed the policy language differently by relying on a technical versus layperson understanding of the word. Id. The ability to understand and apply the policy language at issue in our case does not turn on accepting one definition of "loss" or "occurrence" over another. Instead, proper interpretation hinges on understanding the scope and extent of what constitutes a loss or occurrence under the policy's limitations. The Court finds the situation here more akin to the facts of Chase Resorts, Inc v. Safety Mutual Casualty Corporation, where even after consulting a standard dictionary for a definition of "exhaust," the court found that the policy did not indicate what occurrence or occurrences could exhaust the liability limits of the policy. 869 S.W.2d 145, 150 (Mo. Ct. App. 1994). As a result, the policy was found reasonably susceptible to different interpretations and ambiguous. Id.

Under Missouri law, when an insurance contract is ambiguous it is construed against the insurer. Chase Resorts, 869 S.W.2d at 150. The Missouri Supreme Court has held that where the intended meaning of policy language is unclear, the insurer must bear the burden of the resulting confusion. "[A]s the drafter of the insurance policy, the insurance company is in the better position to remove

ambiguity from the contract." Krombach v. Mayflower Ins. Co., Ltd., 827 S.W.2d 208, 211 (Mo. 1992).

Construing this policy in favor of the insured, I accept Acid Piping's interpretation of the policy language, and agree that each overcharged or double-billed invoice is a separate loss or claim against the insurance policy. Treating each dishonest event that causes "any loss" as an individual claim against the policy is a reasonable understanding of the policy language. In order for Dong Kai to carry out the overcharges alleged here, he would have had to create a fraudulent invoice, direct Acid Piping to make payment to a certain bank account for an inflated amount, direct funds from that account to pay for the products purchased, and keep the remaining funds for himself. All of these acts are required for the end result of overcharging on a single invoice. These actions constitute the "any number of acts" under the policy, that together create a single loss recoverable up to $5,000 (minus the deductible). This interpretation by Acid Piping is not an unreasonable one.

### 3. A Natural and Plain Reading of the Policy as a Whole Supports Acid Piping's Interpretation

Under general principles of insurance policy interpretation in Missouri, limitations on coverage should be construed strictly and a court should be liberal in granting rather than denying coverage protection. Centermark Properties, 897 S.W.2d at 100-01; Missouri Terrazzo, 566 F.Supp at 553. Under these standards, this Court would rule in favor of Acid Piping even if the language were not ambiguous.

A policy of insurance must be construed as a whole and every clause must be given some meaning if it is reasonably possible to do so. Brugioni v. Maryland Cas. Co., 382 S.W.2d 707, 712 (Mo. 1964)(citing Central Sur. & Ins. Corp. v. New Amsterdam Cas. Co., 222 S.W.2d 76, 78, 80 (Mo. 1949)). Great Northern wrote and issued this policy, and it had the ability and opportunity to clarify the policy language. If it expected a certain interpretation of "loss" or "occurrence," it could have included such language in the policy. In fact, Great Northern did include additional limiting language in other provisions of the policy. The 'Limits of Insurance' section of the contract includes limitations for both the 'blanket employee dishonesty' and the 'depositors forgery' coverage. The relevant policy language is as follows:

1.  **blanket employee dishonesty**, for any loss caused by any employee whether acting alone or in collusion with others, either resulting from a single act of any number of acts, regardless of when those acts occurred, during the policy period of this insurance or prior insurance;

2.  **depositors forgery**, for any loss caused by forgery or alteration committed by any person or in which that person is concerned or implicated, either resulting from a single act or any number of acts *regardless of the number of instruments involved* or when, during the period of this insurance or prior to it, such acts occurred.

Policy at 3 (emphasis added). The limiting language for these two coverages is almost identical except for the inclusion of an additional exception relating to the number of instruments involved for depositors forgery.

Missouri law requires that all provisions of an insurance policy should be given effect. M.F.A. Mut. Ins. Co. v. American Family Mut. Ins. Co., 654 S.W.2d 230, 232 (Mo. Ct. App. 1983). Where a term is used in one phrase of a policy, its absence in another phrase is significant. Williams v. North River Ins. Co., 579 S.W.2d 410, 412 (Mo. Ct. App. 1979). In order to give effect to the phrase "regardless of the number of instruments involved," I assume that without such phrase the policy would be interpreted to allow for an individual claim for each forged instrument. The absence of similar limiting language in the 'blanket employee dishonesty' provision is significant and must be given meaning.

I find unpersuasive Great Northern's argument that acceptance of Acid Piping's interpretation of the policy makes certain phrases in the policy superfluous. The phrases "most we will pay," "maximum liability," and "regardless of when those acts occurred," all add meaning to the understanding of this policy. The phrase "most we will pay" limits Acid Piping to the amount of loss or $5,000, for each claim against the policy. As for "maximum liability," Great Northern contradicted its own argument by explaining that "[t]he non-reduction of liability language means just that, Great Northern's liability under the Policy will not be reduced when there is a payment under the Policy, provided that the payment made was part of the <u>separate</u> loss." <u>Def.'s Reply</u> at 9. I have found each loss to be a separate loss and therefore Acid Piping is entitled to the limit of insurance for each claim. The phrase "regardless of when the acts occurred" describes the time period for which the policy covers. It has significance in the policy whether the loss is one or many. No strained reading of the policy is necessary and no words are superfluous.

Additionally, a cardinal rule of contract interpretation is that the court must ascertain the intention of the parties and to give effect to that intention. <u>Boyer v. Sinclair & Rush, Inc.</u>, 67 S.W.3d 627, 631 (Mo. Ct. App.2002). An insurance policy with a five thousand dollar limitation for any number of overcharged or

double billed invoices, provides little to no protection for an insured whose employees handle up to fifty thousand dollars in a single transaction.  When Acid Piping purchased this employee dishonesty protection, it reasonably intended to insure against a single 'loss' from dishonesty and not a total 'scheme' of dishonesty or fraud.

Nor do I believe that this interpretation is counter to public policy.  Great Northern suggests that public policy supports its interpretation because otherwise insureds would have no protection against "petty thieves."  The amount of the deductible is some indication of the levels of loss the parties consider "petty."   The parties can agree to insurance with a lower or higher deductible amount, but this issue should not be used to alter the ordinary and plain reading of the policy language.

As this is a case of first impression in the Eighth Circuit and Missouri there is no mandatory precedent for the Court to follow.  There are some relevant opinions from other jurisdictions that address this question and support the result I reach here.  This case is most analogous to other cases which involve multiple transactions.  In a District Court of Kansas case, the court found several loan swap transactions to be separate occurrences under the policy.  North River Ins. Co. v. Huff, 628 F.Supp. 1129, 1133 (D. Kan. 1985).  In a New Jersey case, a finance

manager for a car dealer submitted twenty-seven fraudulent credit applications to lenders to try to get financing for high-risk customers who wanted to buy cars. The court found that each sale that resulted from a fraudulent credit application constituted a separate occurrence under the employer dishonesty policy. Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 854 A.2d 378 (N.J. 2004).

I have found no case construing identical policy language. The Scirex case, relied on by Great Northern, has similar language, but the few differences are significant. Scirex Corp. v. Federal Ins. Co., 313 F.3d 841 (3rd Cir. 2002). The Scirex policy provided that:

> The most we will pay for any loss under Blanket Employee Dishonesty for any loss caused by any employee whether acting alone or in collusion with others, either resulting from a single act or any number of acts, regardless of when those acts occurred during the period of this insurance or prior insurance, is the amount of loss, not to exceed the Limit of Insurance for Blanket Employee Dishonesty shown in the Declarations.

Id. at 845. However, that policy also contained a separate provision limiting liability: "[a]ll losses resulting from an actual or attempted fraudulent or dishonest act or series of related acts at the premises ... whether committed by one or more persons will be deemed to be one occurrence or event." Id. The policy provisions in this case lack this additional language of limitation to clarify what constitutes "one occurrence or event." This lack of additional limiting language differentiates

the facts of this case from the Scirex case, and justifies a different outcome.

Accordingly,

**IT IS HEREBY ORDERED** that Acid Piping's motion for summary judgment [#24] is granted, and I conclude that Acid Piping is entitled to coverage for each fraudulent invoice submitted by its employee Dong Kai, up to the $5,000 limit, less deductible for each such loss.

**IT IS FURTHER ORDERED** that Great Northern's motion and amended motion for summary judgment [#21, #28] are denied.

**IT IS FURTHER ORDERED** that the Court will hold a telephone conference with all counsel on **Thursday, December 8, 2005, at 1:00 p.m.** to discuss the schedule for the issues remaining in this case. Plaintiff's counsel shall place the call.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 9th day of November, 2005.